1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

INTERMEC, INC.,

                         Plaintiff,

     v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

                 Defendant.

CASE NO. 11-165-BJR

MEMORANDUM ORDER
GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT AND DENYING
PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

       This contractual dispute is before the Court on remand from the Ninth Circuit Court of Appeals. The only remaining issues in this case are Defendant International Business Machines Corporation's ("IBM") breach of contract counterclaims and Plaintiff Intermec, Inc.'s ("Intermec") defense that many of these claims are time-barred by the contract's four-year limitations provision. IBM has moved for summary judgment on the grounds that the contract unambiguously required Intermec to pay IBM certain Minimum fees once the contract ended. (Doc. No. 219). Intermec does not dispute that it breached its contractual obligation by not paying these Minimum fees. However, Intermec moves for partial summary judgment on the grounds that a majority of these Minimum fees were due before the contract period ended and are now time-barred. (Doc. No. 216). After reviewing the briefs and all other relevant material properly before the Court, the Court will GRANT IBM's motion for summary judgment and will DENY Intermec's motion for partial summary judgment.

1

1

I.       BACKGROUND

2

A.   The Parties' Agreement

3

In 1997, IBM entered into an agreement (the "Agreement") with Intermec concerning

4

IBM's radio frequency identification device ("RFID") patents.[1]  (Doc. No. 219 at 5).  Under the

5

Agreement, IBM assigned Intermec the right to license its RFID patents to third parties.  (*Id*).  In

6

return, Intermec agreed to pay IBM for each license in the following way:

7

8

> For a period commencing on the Effective Date and continuing until April
> 15, 2008, for each bare Patent license granted by [Intermec] to a third party
> . . . , [Intermec] shall pay to IBM the greater of: (i) forty percent (40%) of
> any royalty paid in cash or cash equivalent(s) by such third party to
> [Intermec] pursuant to any license granted under the Patents, or (ii)
> $100,000.00 . . . per Patent up to a maximum of $500,000.00.

9

10

11

(Agreement, "Fees for Licenses," Section 10.3.1).

12

Both parties agree that the Agreement required Intermec to pay IBM at least $100,000

13

per patent/up to $500,000 per license (the "Minimum").  However, the parties disagree about

14

when this Minimum amount became due.

15

16

According to IBM, the Minimum amount became due at end of the contract period.

17

(Doc. No. 232).  IBM asserts that Section 10.3.1 required Intermec to pay IBM 40% royalty fees

18

each quarter and then account for the "shortfall," if any, between the royalty fees paid and the

19

Minimum amount owed on April 15, 2008.  (*Id*.).  Intermec counters that the Minimum amount

20

was due immediately after the quarter in which the license was issued, i.e. Intermec must pay the

21

Minimum amount immediately and then account for any surplus royalty profits at the end of

22

each quarter.  This disagreement is significant because Section 19.8 of the Agreement provides

23

24

25

---

[1] In 1997, Intermec's corporate name was UNOVA.  While the relevant documents reference UNOVA, both parties
agree that for the purposes of this case UNOVA and Intermec's contractual rights and obligations are the same.  (*See*
Doc. No. 219 at 5).

that "[n]either party may bring an action . . . arising out of performance of this Agreement more than four years after the cause of action has accrued."  (Agreement, Section 19.8).

Two additional provisions of the Agreement are relevant for the purposes of this memorandum opinion.  Section 10.4.1 provides that Intermec must prepare a report every quarter detailing the amount of royalties owed to IBM under Section 10.3.1.  Section 10.4.2 states that "[a]ll payments due under [Section 10.3.1] shall be due . . . within 60 days after the conclusion of each Calendar Quarter."

B.  Rapid Start Licenses

In 2005, Intermec began issuing licenses called "Rapid Starts" to third parties.  (Doc. No. 216 at 7).  Rapid Starts licenses contained RFID patents acquired from IBM under the Agreement.  (Doc. No. 197).  Therefore, Rapid Starts were subject to Section 10.3.1 of the Agreement.  (Doc. No. 219 at 7).  From 2005 to April 2008, Intermec paid IBM 40% of its Rapid Starts royalty income every quarter, as required under Section 10.3.1.  (*Id.* at 6).  However, Intermec did not pay IBM the Minimum amount at the end of the quarter in which each license was issued, nor did it account for any "shortfalls" at the end of the contract period.

Instead, in April 2008, shortly before the contract period ended, Intermec announced a new interpretation of the contract: the Rapid Starts licenses were actually "products," not licenses, and were governed by Section 10.2.1, which required only 5% royalty fees and no Minimum amounts.  (Doc. No. 219 at 9).  When the contract period ended, IBM demanded Intermec pay the difference between the royalty payments and the Minimum amounts required under Section 10.3.1.  Intermec, in turn, sent IBM an invoice demanding a refund for the difference between the 40% Rapid Start royalty payments it made pursuant to Section 10.3.1 and

the 5% payments it claimed were actually due under the Section 10.2.1 of the Agreement.  (Doc. No. 197 at 2).  IBM refused to provide a refund.

C.  <u>Procedural History</u>

On January 31, 2011, Intermec filed a complaint in the Western District of Washington against IBM.  (Doc. No. 1).  Intermec asserted that IBM was only entitled to 5% in royalty fees, not 40%, and, therefore, Intermec had overpaid IBM by "at least $1,699,377.93."  (*Id.* at para. 20).  On February 22, 2008, IBM filed a counterclaim against Intermec, arguing that Intermec owed IBM roughly $8 million in "shortfall" fees under Section 10.3.1.  (Doc. No. 18 at 11).

Intermec and IBM each moved for partial summary judgment, arguing that the Rapid Starts were governed by Section 10.2.1 and 10.3.1, respectively.  (Doc. No. 55).  The district court ruled in Intermec's favor, holding that Section 10.2.1 governed the Rapid Start licenses, i.e. Intermec only owed IBM 5% royalty fees and no Minimum amounts.  (Doc. No. 90)(Judge Coughenour presiding).[2]

On March 29, 2012, the jury returned a verdict in Intermec's favor.  (Doc. No. 159).  On November 10, 2012, IBM appealed the district court's partial summary judgment ruling to the Ninth Circuit Court of Appeals.  (Doc. No. 186).  The Court of Appeals reversed, holding that the Rapid Starts licenses were governed by Section 10.3.1.  (Doc. No. 197 at 3).  It remanded the case for adjudication of IBM's counterclaims and "any defenses that [Intermec] had properly pleaded."  (Doc. No. 197 at 3).

After the mandate was issued, both parties again moved for summary judgment.  IBM asserts that, since the Court of Appeals found that the Rapid Starts licenses are governed by

---

[2] IBM also argued that Intermec's claims were time-barred under the Agreement's four-year four provision because Intermec's cause of action accrued when it made the first alleged overpayment.  The district court also found that Intermec's claims were not time-barred because Intermec's claim did not accrue until it demanded a refund in April 2008.

Section 10.3.1, there can be no dispute that Intermec breached the contract by failing to pay the Minimum amounts when the contract ended.  Intermec's partial motion for summary judgment asserts that the Rapid Starts licenses were due at the end of the quarter in which they were issued, not at the end of the contract period.  Since most of the Rapid Starts licenses were issued more than four years before IBM filed its counterclaims, Intermec contends that most of IBM's counterclaims are time-barred.

II.      LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court "should review all of the evidence in the record . . . [and] draw all reasonable inferences in favor of the nonmoving party."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, "[t]he mere existence of a scintilla of evidence" in support of a nonmoving party's position is not sufficient to create a genuine issue of material fact. *Anderson*, 477 U.S. at 252.

III.     <u>DISCUSSION</u>

Intermec did not oppose IBM's arguments that Intermec breached its contractual obligations to pay the Minimum amounts.  Therefore, the only remaining issues in this case are whether any of IBM's counterclaims are time-barred and what damages are appropriate.

5

A. <u>IBM'S COUNTERCLAIMS ARE NOT TIME-BARRED</u>

According to Intermec, most of IBM's counterclaims are time-barred.  (Doc. No. 216).

Section 19.8 of the Agreement provides that "[n]either party may bring an action . . . arising out

of performance of this Agreement more than four years after the cause of action has accrued."

(Agreement, Section 19.8).  A breach of contract action accrues at the time the breach occurs.

*Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (N.Y. 1993).[3]  Here, Intermec sold

Rapid Starts licenses between 2005 and April 15, 2008.  However, IBM did not bring its

counterclaims until February 22, 2011.  Therefore, the question presented is whether each

Minimum amount was due at the end of the quarter in which any Rapid Starts license was sold or

whether the Minimum amounts were not due until the end of the contract period, April 15, 2008.

      i.     *The Agreement Unambiguously States that the Minimum Payment Is Not Due Until the End of the Contract Period*

Summary judgment is only proper in contract disputes if the language of the contract is

"wholly unambiguous."  *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115

(2d Cir. 1994).  A contract is ambiguous if it is susceptible to more than one reasonable

interpretation.  *Id.*

IBM asserts that the Agreement unambiguously required Intermec to pay the 40% royalty

fees on a quarterly basis and then account for any "shortfall" at the end of the contract period.

IBM provides three arguments in support of this interpretation.

According to IBM, the language in Section 10.3.1 clearly leaves Intermec's obligation to

pay the Minimum amount for each license open until April 15, 2008.  Section 10.3.1 provides

that Intermec's obligation to pay at least the Minimum amount spanned "a period commencing

on the Effective Date and continuing until April 15, 2008."   Since the payment period continues

---

[3] Both parties agree that New York law applies to this issue.

until the contract period ends, IMB argues, Intermec could fulfill its contractual obligations by paying the Minimum amount at any point within this period, i.e. until April 15, 2008.

IBM contends that the absence of quarterly reporting and payment requirements for the Minimum amounts shows that the Minimum amounts are not due quarterly, but rather are due at the end of the contract period. According to IBM, the Agreement's silence on this issue is especially significant because two sections of the Agreement – Section 10.4.1 and Section 10.4.2 – explicitly set out quarterly reporting and payment requirements for the royalty fees. IBM further asserts that, in the absence of quarterly payment requirements, the Minimum amounts were to be due on the only other date-certain in Agreement: April 15, 2008.

According to IBM, the order in which the payment obligations are listed – 40% royalty fee payments first and Minimum amounts second – also shows that royalty fees were due at the end of each quarter and the Minimum amounts were due later. Since the only two dates in the Agreement are the ends of each quarter and the end of the contract, IBM argues, the royalties must be paid on the earlier date (each quarter's end) and the Minimum amounts on the later date (the end of the contract period).

Intermec offers three points in rebuttal to IBM's interpretation; none of which are persuasive.

Intermec asserts that the "[f]or a period commencing . . . until April 15, 2008" language implies that all payments, including the Minimum amount, must be made "in" the contract period. (Doc. No. 229 at 9). However, nothing in the contract suggests that all payments must be made "in" the contract period: the relevant language is "for," not "in." Furthermore, Section 10.4.2, which requires all payments due under Section 10.3.1 to be paid no later than 60 days

after they are due, specifically contemplates that the last payment will be made outside the contract period.

Intermec also contends that IBM's interpretation could lead to absurd results. (Doc. No. 229 at 10). According to Intermec, if Intermec issued a license for which it never received any royalties, IBM would have to wait until the end of the contract period before collecting any payment for that license. (*Id.*). A contract should not be interpreted so as to produce an absurdity, i.e. defeat the purpose of the contract or render any provision meaningless. *Saffire Corp. v. Newkidco, LLC*, 286 F. Supp. 2d 302, 308 (S.D.N.Y. 2003). However, the mere fact that the Agreement might not be optimal in certain circumstances is not an absurd result.

Intermec also advances a different interpretation of the Agreement: each Minimum amount is due at the end of the quarter in which it was issued. The Court finds this interpretation unreasonable. According to Intermec, Section 10.4.2 states that all Minimum fees, including the Minimum amount, are due at the end of each quarter. Section 10.4.2 provides that "[a]ll payment due under Articles 10.2 and 10.3 shall be due . . . within 60 days after the conclusion of each Calendar Quarter." This provision clearly requires that all payments "due" under Section 10.3.1 must be made within 60 days after the end of each quarter. However, this provision has no bearing on when payment *becomes* "due" under 10.3.1; it only discusses when something that has already become due under Section 10.3.1 should be paid. Moreover, this interpretation would conflict with the sequence of payment clearly set out in Section 10.3.1. Under Intermec's interpretation, the payments due under part (i) would be due, if at all, *after* the payments under part (ii) have been made.

Accordingly, the Court finds that the Agreement unambiguously states that the Minimum amount became due on April 15, 2008.

ii.   *Extrinsic Evidence Unambiguously Shows that the Minimum Payment Is Not Due Until the End of the Contract Period*

Even if the Agreement were ambiguous, extrinsic evidence confirms that the parties intended and understood that the Minimum amount became due at the end of the contract period. If a court finds that a contract is ambiguous, it may look to extrinsic evidence to determine the parties' intent. *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F. 3d 101, 111 (2d Cir. 2006); *Time Warner Cable v. City of New York*, 943 F. Supp. 1357, 1390 (S.D.N.Y. 1996)(finding parties' interpretation of the contract prior to litigation "compelling" evidence of intent).

The record reflects that Intermec's corporate officers testified that they understood that the Minimum amount was due at the end of the contract period.  (Doc. No. 219, Ex. E, Trial Testimony of Comparone at 164:2-22)(shortfall due to IBM if Intermec did not "meet that threshold by 2008, April 14th").  Furthermore, Intermec's records listed the Minimum amount owed for each Rapid Starts license as a future liability, noting that the Minimum amount was not due until April 2008.  (*Id*. at 168:4-25); *see also* Doc. No. 219, Ex. F., at IN-IBM0024673 ("when licenses expire in 2008, if haven't paid $500K per licensee to IBM, must make up the shortfall").  Intermec did not in any way addresses these issues about the parties' pre-litigation understanding.  *See* Fed. R. Civ. P. 56 (e).  Accordingly, the Court finds that, even if the Agreement were ambiguous, the extrinsic evidence, viewed in the light most favorable to Intermec, unambiguously confirms IBM's interpretation of the Agreement.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

For the reasons set forth above, the Court finds that IBM's breach of contract claims accrued on April 15, 2008.  Since IBM brought all of its breach of contract counterclaims on February 22, 2011, all the counterclaims are timely.[4]

B.  IBM IS ENTITLED TO EXPECTATION DAMAGES AND PREJUDGMENT INTEREST

Since IBM's counterclaim is timely and all other aspects of liability have been determined, the only remaining issue is damages.

Under New York law, the proper measure of damages for breach of contract is "the amount necessary to put the plaintiff in as good a position as he would have been if the defendant had abided by the contract."  *W. Geophysical Co. of Am. v. Bolt Associates, Inc.*, 584 F.2d 1164, 1172 (2d Cir. 1978).

IBM provides a detailed calculation of the amount Intermec was obligated to pay under the Agreement.  (Doc. No. 219 at 15).  Intermec does not object to any component of this calculation.  The Court, finding that IBM's calculation accurately represents the amount IBM would have been paid had Intermec performed under the Agreement, finds that IBM is entitled to $5,237,159.77.

The Court further finds that IBM is entitled to 10% in prejudgment interest on this amount as provided in Section 10.4.5 of the Agreement.

---

[4] Intermec asserts that there is an issue of material fact as to which Rapid Start licenses are "bare Patent" licenses and, therefore, subject to Section 10.3.1.  The Court of Appeals specifically held that "the plain meaning of the language of the Agreement obligates Intermec to pay IBM fees for the Rapid Start Licensing Agreements under Section 10.3.1 of the Agreement."  (Doc. No. 197 at 2; Doc. No. 232 at 12).  Thus, this issue has already been decided.

IV.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Intermec's Motion for Partial Summary Judgment is DENIED, (Doc. No. 216);

(2) IBM's Motion for Summary Judgment is GRANTED, (Doc. No. 219);

(3) Judgment shall be entered in favor of IBM and against Intermec in the amount of $5,237,159.77 plus 10% prejudgment interest (to be calculated in accordance with Section 10.4.5 of the Agreement); and

(4) The parties are to meet and confer regarding the calculation of prejudgment interest in this matter and, if possible, submit an agreed upon calculation to the Court.  The parties shall notify this Court within 10 days of the entry of this Order as to the status of their discussions regarding the calculation.

**So ordered.**

Dated this 18th day of November, 2014.

Barbara J. Rothstein
United States District Judge